ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| GEOVANNIE ORTIZ PÉREZ<br><br>Recurrente<br><br>v.<br><br>DEPARTAMENTO DE CORRECCIÓN Y REHABILITACIÓN<br><br>Recurrido | TA2025RA00020 | *Revisión Judicial* procedente del Departamento de Corrección y Rehabilitación<br><br>Caso Núm.: 1-88190<br><br>Sobre: Reclasificación de custodia |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Marrero Guerrero y el Juez Campos Pérez

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 13 de agosto de 2025.

El Sr. Geovannie Ortiz Pérez (señor Ortiz Pérez o recurrente), miembro de la población correccional, solicita nuestra intervención para revisar la *Resolución* del Comité de Clasificación y Tratamiento (CCT) del Departamento de Corrección y Rehabilitación (DCR), emitida el 16 de mayo de 2025;[1] y el *Acuerdo del Comité de Clasificación y Tratamiento*, notificado el 29 de mayo de 2025.[2] En la referida determinación, el CCT acordó reclasificar la custodia mínima a custodia máxima. En observancia, el DCR trasladó al recurrente de la institución carcelaria Bayamón 501 a Guayama 296.

**I.**

Del expediente que revisamos se desprende que, sentenciado el 3 de noviembre de 2000, el recurrente ingresó al DCR el 23 de febrero de 2011 bajo custodia máxima, para cumplir una sentencia de 152 años y seis meses.[3] El 27 de septiembre de 2018, se reclasificó su custodia a mediana; y el 11 de octubre de 2023, a mínima. Durante el referido periodo, el señor Ortiz Pérez participó de varios talleres en cumplimiento de su plan

---

[1] Véase, *Resolución* en el expediente electrónico de autos.
[2] Véase, Anejo I.
[3] Previo a su ingreso al DCR, el señor Ortiz Pérez extinguía una sentencia a nivel federal.

institucional. El mínimo de su sentencia se estima para el 6 de mayo de 2029; y el máximo, el 25 de julio de 2130.

Ahora, mediante la Querella 2015-25-0021, el 30 de abril de 2025, el recurrente resultó incurso por dos violaciones a la Regla 16, *Actos prohibidos de Nivel II (Menos Grave)*, incisos 220 y 224, del *Reglamento para establecer el procedimiento disciplinario de la población correccional*, Reglamento Núm. 9221 de 8 de octubre de 2020. En particular, por *mentir o dar información falsa* y *realizar llamadas telefónicas no autorizadas*. Como sanción, se le suspendieron los privilegios institucionales durante 40 días naturales.

Posteriormente, debido a la convicción del confinado por las violaciones disciplinarias de Nivel II, conforme con la Sección 7 III(B)(2) del Reglamento Núm. 9151, *infra*, el CCT realizó una revisión automática no rutinaria de su nivel de custodia. El recurrente arrojó una puntuación de **11** en la Escala de Reclasificación de Custodia, la cual corresponde a **custodia máxima**,[4] según la reglamentación citada.[5] El resultado es la suma de la extrema gravedad de los cargos (**6**) del renglón 1,[6] las recientes dos acciones disciplinarias (**4**) del renglón 4, añadidas a las acciones disciplinarias previas de Nivel II desde la última clasificación (**5**) en el renglón 5, para un subtotal de **15**. A esta cifra se le restaron cuatro puntos, correspondientes a la participación en programas de tratamiento del renglón 7 (**-2**) y la edad del recurrente en el renglón 8, quien excede los 40 años (**-2**), para un total de **11**.[7]

El formulario señala también que al señor Ortiz Pérez se le asignó a una población de custodia protectiva. En esta modalidad no punitiva, se

---

[4] La custodia máxima se refiere a aquellos "[c]onfinados de la población general que requieren un grado alto de control y supervisión. A estos individuos se les puede restringir de determinadas asignaciones de trabajo y de celda, así como de determinadas áreas dentro de la institución, según se estime necesario por razones de seguridad". Véase, Sección 1, *Definiciones claves y glosario de términos*, Reglamento Núm. 9151.

[5] Véase, *Escala de Reclasificación de Custodia (Casos Sentenciados)* anejada con la *Resolución*.

[6] En referencia a los delitos de asesinato en primer grado, conspiración, uso de disfraz, varias violaciones a la Ley de Armas y a la Ley de Sustancias Controladas por los que el recurrente resultó convicto.

[7] En los incisos no mencionados, el recurrente arrojó cero.

separa a los confinados de otros confinados por razones de seguridad. En algunas situaciones, la reclusión tiene lugar en una celda individual o en una celda doble, dependiendo de las circunstancias que hayan motivado dicha ubicación. Véase, Sección 1, *Definiciones claves y glosario de términos*, Reglamento Núm. 9151, *infra.*

Así las cosas, el CCT emitió su *Acuerdo* en el que solicitó el traslado del recurrente a Bayamón 282, Guayama 296 o Máxima Seguridad Ponce. El señor Ortiz Pérez fue trasladado a Guayama 296. Inconforme con este proceder, el recurrente presentó oportunamente el presente recurso y señaló la comisión de los siguientes errores:

Erró la Administración de Corrección y Rehabilitación y la unidad de Clasificación a Nivel Central y la Unidad de Control de Población al no seguir con la orden del Tribunal [de] Apelaciones y reglas establecidas en el Manual de Clasificación de Confinado[s] N[ú]m. 8281 de 30 de noviembre de 2012, Sección 8, *Traslados entre Instituciones* de p[á]g. 58 Inciso II. *Consideraciones de Traslado* en la n[ú]m. 8.

Err[ó] la Administraci[ó]n de Corrección y Rehabilitación y la Unidad de Clasificación a Nivel Central y la Unidad Control de Población, al no cumplir con la orden [del] Tribunal N[ú]m. KLRA201900463 y no cumplir con la Ley N[ú]m. 130 de 26 de octubre de 2009, inciso (G) Art[í]culo 50, de la Ley N[ú]m. 116 [de 22 de julio] de 1974.

Err[ó] la Administraci[ó]n de Corrección y Rehabilitación y la Unidad de Clasificación a Nivel Central y la Unidad de Control de Población al cumplir [*sic*] con el mandato constitucional establecido mediante la Ley N[ú]m. 377 Art. (3) inciso (B) de 16 de septiembre [de] 2004.

Err[ó] la Administraci[ó]n de Corrección y Rehabilitación y la Unidad de Clasificación a Nivel Central y la Unidad de Control de Población al no cumplir con la Secci[ó]n 19 del Art[í]culo VI de la Constitución de Puerto Rico; y violar el Art[í]culo (11 y e[l] Art[í]culo (2) de la Ley N[ú]m. 116 de 22 de julio de 1974.

Err[ó] la Administración de Corrección y Rehabilitación y la Unidad de Clasificación a Nivel Central y la Unidad de Control de Población, al violar el derecho Constitucional que tiene el recurrente de poder estar cerca geogr[á]ficamente de su n[ú]cleo familiar y as[í] pueda aumentar sus visitas y no se afecte su plan institucional.

Err[ó] la Administraci[ó]n de Corrección y Rehabilitación y la Unidad de Clasificación a Nivel Central y la Unidad de Control de Población al pasar por alto el ajuste y progreso ex[c]elente y la buena conducta que tiene el recurrente que se encontraba estudiando contabilidad [en] University Caribbean matriculado [el] 1 de mayo de 2025 y durante su confinamiento de 22 años no [h]a incurrido en querella y

escrito malos [h]asta ahora que sali[ó] incurso de querella Nivel II.

En cumplimiento de nuestra *Resolución,* el 29 de julio de 2025, por conducto de la Oficina del Procurador General, el DCR presentó su postura.[8] Con el beneficio de ambas comparecencias, resolvemos.

## II.

## A.

Revisamos la *Resolución* en el caso del epígrafe, al palio del Artículo 4.002 de la Ley Núm. 201 de 22 de agosto de 2003, según enmendada, *Ley de la judicatura del Estado Libre Asociado de Puerto Rico de 2003,* 4 LPRA sec. 24 *et seq.* (Ley Núm. 201-2003), el cual dispone en lo atinente que el Tribunal de Apelaciones tendrá jurisdicción para revisar "como cuestión de derecho […] las decisiones finales de los organismos y agencias administrativas". 4 LPRA sec. 24u; además, Art. 4.006 de la Ley Núm. 201-2003, 4 LPRA sec. 24y. En consonancia, la Ley Núm. 38 de 30 de junio de 2017, *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAUG), 3 LPRA sec. 9601 *et seq.,* establece un procedimiento uniforme de revisión judicial a la acción tomada por un ente gubernamental al adjudicar un caso administrativo. En particular, la Sección 4.5 de la LPAUG, 3 LPRA sec. 9675, que versa sobre el **alcance de la revisión judicial**, estatuye que este tribunal intermedio sostendrá las determinaciones de hechos de las decisiones de las agencias, si se basan en evidencia sustancial que obra en el expediente administrativo; revisará en todos sus aspectos las conclusiones de derecho; y podrá conceder al recurrente el remedio apropiado si determina que a éste le asiste el derecho. En esencia, examinamos que las determinaciones fácticas sean cónsonas con la totalidad del expediente administrativo y que el ente gubernamental haya realizado una aplicación o interpretación correcta de

---

[8] El DCR solicitó la desestimación de la causa. Se basó en la falta de pago de los aranceles y el hecho de que el señor Ortiz Pérez no presentó la *Solicitud y declaración para que se exima de pago de arancel por razón de indigencia.* Sin embargo, es meritorio mencionar que el recurrente expresó en su recurso que, en varias ocasiones, solicitó el formulario y no se lo habían entregado, hasta el día en que instó el caso de autos. La afirmación no fue refutada por el DCR. En vista de ello, la desestimación no procede.

las leyes o reglamentos que se le ha encomendado administrar. Por igual, auscultamos que el organismo haya actuado dentro de los parámetros de su ley habilitadora, libre de arbitrariedades y en observancia a los derechos constitucionales fundamentales. Véase, *Torres Rivera v. Policía de PR*, 196 DPR 606, 628 (2016).

Por consiguiente, al momento de justipreciar la valoración y razonabilidad de las decisiones administrativas adoptadas por las agencias del poder ejecutivo, los tribunales tenemos la obligación de ejercer un juicio independiente de las disposiciones legales para determinar si una agencia ha actuado o no dentro de los límites de su autoridad estatutaria, incluso en los casos de ambigüedad legislativa. Véase, *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024); 603 US __ (2024); *Vázquez v. Consejo de Titulares*, 2025 TSPR 56, 215 DPR __ (2025).[9] Claro está, según ha pautado el Tribunal Supremo federal y ha refrendado nuestro alto foro, las interpretaciones y los dictámenes administrativos —realizados por virtud del cumplimiento de un deber oficial y basados en su experiencia especializada— pueden constituir un cuerpo de experiencia y un juicio informado ("body of experience and informed judgment") al que los foros revisores y los litigantes pudiéramos recurrir en cuestiones jurídicas. *Loper Bright Enterprises v. Raimondo, supra,* pág. 2259; *Vázquez v. Consejo de Titulares, supra.* Ahora, el peso persuasivo de la determinación administrativa va a depender de la minuciosidad en su consideración, de la validez de su razonamiento, así como de su congruencia con pronunciamientos anteriores y posteriores. Véase, *Skidmore v. Swift & Co.*, 323 US 134, 139-140 (1944), citado con aprobación en *Loper Bright Enterprises v. Raimondo, supra.* Es decir, las interpretaciones de las agencias "constituyen un acervo de experiencias y criterios informados a los cuales los tribunales y los litigantes bien podrán recurrir a modo de guía". *Vázquez v. Consejo de Titulares, supra.* Así, pues,

---

[9] *Opinión* de 21 de mayo de 2025 (Hon. Kolthoff Caraballo).

**el norte al ejercer nuestra facultad revisora es el criterio de razonabilidad**. *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 127 (2019); *Torres Rivera v. Policía de PR, supra*, pág. 626; *Empresas Loyola v. Com. Ciudadanos*, 186 DPR 1033, 1042-1043 (2012); además, *Vázquez v. Consejo de Titulares, supra*.[10]

**B.**

En atención a los asuntos del caso que nos ocupa, el Plan de Reorganización Núm. 2 de 21 de noviembre de 2011, según enmendado, *Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011*, 3 LPRA Ap. XVIII, (Plan de Reorganización), ordena al Secretario del Departamento de Corrección y Rehabilitación a velar por los derechos de los miembros de la población penal que atiende. Al respecto, el Artículo 9 del Plan de Reorganización, *Derechos de la clientela*, establece en el inciso (k), a enviar "a la **institución correccional más cercana posible a la localidad geográfica en que se encuentre el núcleo familiar del miembro de la población correccional**, sujeto a que no se afecte su plan institucional, no conlleve un riesgo a su seguridad y exista la disponibilidad de espacio en la referida facilidad". (Énfasis nuestro). 3 LPRA Ap. XVIII, Art. 9(k).

De otro lado, el *Manual para la clasificación de los confinados*, Reglamento Núm. 9151 de 22 de enero de 2020, regula en su Sección 8 los **traslados entre instituciones de los confinados**. Entre otras cosas, dispone de ciertos factores para fundamentar el traslado de un confinado de una institución a otra. Éstos son:

1. El control de la población y razones de manejo de la población;
2. **Cambios en el nivel de custodia de los confinados**;
3. Comportamiento continuo que represente un serio problema de adaptación, que no se ajuste a las normas de la institución y al plan institucional del confinado;
4. Recomendación emitida por un Tribunal;
5. Necesidades de cuidado médico o de tratamientos (no discrecional)

---

[10] Véase, *Opinión de Conformidad* del Hon. Estrella Martínez.

6. Necesidad de tratamiento psiquiátrico o psicológico; (no discrecional)
7. Riesgo de fuga:
8. **Para ubicar al confinado más cerca de sus hogares y familias**, o aumentar las visitas a los confinados;
9. Permitir que el confinado participe en programas de trabajo, educativos y de otro tipo recomendados.
10. **Traslado de custodia protectiva** ubicados en la Unidad Especial de Vivienda (segregación) a la población general; y
11. Traslado de segregación administrativa a la población general. (Énfasis nuestro). Reglamento Núm. 9151, Sec. 8 II(A).

En cuanto a los procedimientos de las solicitudes de traslado, la reglamentación aludida establece que la Oficina de Clasificación de Confinados es el ente que toma la determinación. Luego, la remite a la Oficina de Manejo de Control de Población, el organismo responsable del traslado y ubicación del confinado. Las solicitudes pueden ser iniciadas a instancia de las instituciones carcelarias o del propio confinado. **En el caso de los miembros de la población penal con estatus de sentenciados, la petición de traslado se presenta a través del técnico de servicios sociopenales al Comité de Clasificación y Tratamiento de la institución para su correspondiente evaluación**. Véase, Reglamento Núm. 9151, Sec. 8 IV(B). En el aludido trámite, para adoptar una determinación final, se siguen los siguientes pasos:

1. Revisar los fundamentos de la solicitud para un traslado entre instituciones;
2. **Revisar la puntuación inicial o de reclasificación actual del confinado en la escala de evaluación de custodia y el nivel de custodia al presente**;
3. Revisar las puntuaciones de necesidades presentes del confinado;
4. Revisar el Formulario de Clasificación de Salud más reciente sobre el confinado y cualquier información especial sobre vivienda que sea pertinente;
5. Comprobar que el nivel de custodia actual del confinado y sus necesidades de programas concuerdan con los que ofrece la institución a la cual se pide traslado;
6. Devolver los documentos a la institución que haya presentado la solicitud para que sean corregidos o aclarados, si fuera necesario;
7. **Emitir una decisión final sobre la solicitud**.
8. Enviar la decisión del traslado entre instituciones a la Oficina de Manejo de Control de Población para su ubicación.
9. **La Oficina de Clasificación de Confinados podrá intervenir en decisiones de traslados entre confinados de entenderlo necesario por razones de seguridad,**

**problemas de espacios u otras situaciones**. (Énfasis nuestro). Reglamento Núm. 9151, Sec. 8 IV(C).

**III.**

En la causa presente, el señor Ortiz Pérez alega que el traslado a Guayama 296 le dificulta relacionarse con su familia debido a la distancia. Indica que el CCT pudo imponerle una custodia mediana y que extinguiera su condena en la institución carcelaria Bayamón 501. Además, apunta a que dicho traslado es contrario a la orden de esta curia, emitida en el caso KLRA201900463.[11] Por ello, en su súplica, nos compele a ordenar al DCR a cumplir con lo ordenado en el referido caso, así como a su traslado a Bayamón 501 o 292, por ser ésta la institución más cercana a su familia.

Como cuestión de umbral, es preciso clarificar que en el caso KLRA201900463, al que hace referencia el recurrente, no establecimos que extinguiera su condena en alguna institución carcelaria en específico. Si bien, en esa ocasión, el señor Ortiz Pérez recurrió una denegación de traslado, lo cierto es que, pendiente el trámite, el DCR aprobó su traslado a Bayamón 501. Según reseñamos, para esa fecha, el señor Ortiz Pérez estaba clasificado bajo custodia mediana. En consecuencia, el panel hermano desestimó el caso ante sí, por falta de jurisdicción, toda vez que se tornó académico.

En cuanto a que el CCT debió otorgarle una custodia mediana, al recurrente no le asiste la razón. Del propio formulario intitulado *Escala de Reclasificación de Custodia* surge palmariamente que arrojó una puntuación de 11. En el documento se consigna que la **custodia máxima** corresponde a 7 puntos o más en los renglones del 1 al 3 u 11 puntos o más en los renglones del 1 al 8. Véase, Apéndice D, Sección III, Reglamento Núm. 9151, *supra*. En el caso del señor Ortiz Pérez, aunque entre los renglones 1 al 3 tuvo una puntuación de 6 (inciso 1, extrema gravedad de los cargos); obtuvo una **puntuación total de custodia ascendente a 11**

---

[11] Véase, Anejo 2, *Moción en cumplimiento de Orden* presentada por el Procurador General en el caso KLRA201900463, de cuya *Sentencia* tomamos conocimiento judicial.

**puntos en los renglones del 1 al 8**. Así, pues, en consonancia con la puntuación arrojada, el DCR reclasificó la custodia bajo máximas restricciones.

Finalmente, en torno a la contención del recurrente sobre que se encuentra recluido lejos de su familia, según lo esbozado, tanto el Plan de Reorganización, *supra,* como el Reglamento Núm. 9151, *supra,* contemplan la ubicación de los confinados en instituciones cercanas a sus hogares y familias. Claro está, **la designación está sujeta a la disponibilidad de espacio, a que no se afecte el plan institucional ni conlleve un riesgo de seguridad**. Es decir, al recurrente no le asiste el derecho a ser ubicado en una cárcel específica. Sin embargo, ello no es óbice para que, en observancia al procedimiento establecido, solicite formalmente un traslado. Ya lo ha hecho anteriormente. Empero, en este caso, no existe una decisión final sobre una petición de traslado ante el área concernida del DCR que sea revisable por esta curia.

### IV.

Por los fundamentos expresados, los cuales hacemos formar parte de este dictamen, confirmamos la *Resolución* impugnada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones